TULKISARMUTE NATIVE COMMUNI-
TY COUNCIL; People of the Vil-
lage of Tuluksak, Appellants,

v.

Harold HEINZE, Commissioner, Depart-
ment of Natural Resources; Ric Da-
vidge, Director, Division of Water, Ap-
pellees,

Calista Corporation; Tuluksak Dredging,
Intervenors–Appellees.

No. S–5711.

Supreme Court of Alaska.

July 28, 1995.

Eric Smith, Anchorage, for appellants.

John T. Baker, Asst. Atty. Gen., Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellees.

Frederick H. Boness, Preston, Thorgrimson, Shidler, Gates & Ellis, Anchorage, for Calista Corporation.

James N. Barkeley and Paul K. Wharton, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for Tuluksak Dredging.

Before MOORE, C.J., RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

OPINION

EASTAUGH, Justice.

I. *INTRODUCTION*

Tulkisarmute Native Community Council, the tribal government of the Village of Tuluksak, and Tuluksak residents (collectively TNCC) challenge the decision of the Department of Natural Resources (DNR) to extend fifteen permits for the appropriation of water in the Tuluksak River and its tributaries.[1] The water is to be used for placer gold mining, a procedure in which overburden is removed from streambeds and nearby lands and the underlying gravels are mixed with water and run through a sluicebox. Because the water is taken from a stream, state law requires that it be appropriated. Residents of the Village of Tuluksak rely on the river for subsistence fish and wildlife uses and oppose the permit extensions. They contend that the extensions are without basis, and

violate applicable regulations and article VIII, section 13 of the Alaska Constitution. They assert that appropriation of water for placer mining threatens the quantity and quality of the water and the health of fish and wildlife populations. DNR and intervenors Tuluksak Dredging, Ltd. (TDL) and Calista Native Corporation (Calista) (collectively TDL) support extending the permits so that TDL may continue placer mining on the Tuluksak River.

II. *FACTS AND PROCEEDINGS*

In 1981 and 1982, TDL applied for water rights for placer mining on the Tuluksak River and its headwater tributaries.[2] In February 1982 DNR issued permit ADL 209433–P, authorizing the appropriation of 6.0 cubic feet of water per second (cfs). In June 1982 DNR issued a second permit, ADL 213090–P, authorizing the appropriation of 7.0 cfs. ADL 213090–P expired in March 1985; ADL 209433–P expired in March 1986. In December 1986 DNR extended the permits for another four years. However, instead of issuing two extended permits, DNR separated the two original permits into fifteen separate permits.[3] Each of the fifteen permits authorized an appropriation of 5.6 cfs.

In February 1990, in anticipation of the expiration of the 1986 permits, ADF & G reported to DNR the likelihood that in seven of the stream locations, less than 5.6 cfs of streamflow existed. Consequently, ADF & G concluded that permitting appropriation of

---

1. The challenged permit extensions are as follows: Permit Extensions ADL 209433, ADL 213050, LAS 5670, LAS 5672, LAS 5674, LAS 5675, LAS 5676, LAS 5677, LAS 5678, LAS 5679, LAS 5680, LAS 5681, LAS 5682, LAS 5683, and LAS 5684.

2. The Tuluksak River has its headwaters in the Kilbuck Mountains. The river is ninety miles long and drains approximately 830 square miles of southwestern Alaska before entering the Kuskokwim River. Gold placer mining operations began on the Tuluksak in the early 1900's.

 In a 1983 report, the Alaska Department of Fish and Game (ADF & G) reviewed the permit applications since 1981 and characterized the Tuluksak River as a "major contributor to the Kuskokwim River commercial fishery." ADF & G estimated that the Tuluksak contributes seven-

teen percent of the salmon in the Kuskokwim River drainage. It also found that the portion of the river proposed for diversion and mining "contains the highest quality king salmon spawning habitat in the Tuluksak River drainage." Further, ADF & G reported that

 91% of the king salmon, 92% of the chum salmon, 100% of the pink salmon and an unknown percent of the coho salmon spawning in the Tuluksak River occurs downstream of ... [this portion] and is exposed to the detrimental effects of the increased turbidity and sediment loads which will result from instream mining by ... [operating a mining company's] dredge.

3. DNR separated the permits for "administrative purposes so that for each stream (source of water) being used within the mining block there is a separate water right file."

that amount would effectively deprive those streams of all their water.[4] ADF & G requested that DNR supply specific information on those streams and an additional stream to complete its review.[5] DNR apparently never responded to these requests.

When the fifteen 1986 permits expired in March 1990, TDL applied for an extension of each of the permits.[6] DNR issued TDL temporary water use permits for the 1990 mining season.

In October 1990 DNR held a public hearing in Tuluksak at which villagers testified and unanimously opposed the extensions. The villagers described a variety of adverse impacts on the river which they attributed to mining: the river had grown shallow; the water was no longer safe to drink; the number of fish in the river had decreased dramatically; and the water had discolored river boats. By letter the villagers also asked that DNR not extend the permits and asserted that DNR had committed specified procedural and substantive errors.

In its April 22, 1991 written decision on the request for extension of the permits, DNR extended the permits through October 31, 1993, the end of the 1993 mining season. DNR rejected the villagers' view that TDL's mining adversely affected the quality and quantity of the water. DNR indicated that the turbidity resulted from natural causes; there was no proof mining caused loss of water depth, lower fish populations, and health problems; the use of water for mining is nonconsumptive because TDL operates a 100% water recycling system; and each creek contained sufficient water to support the withdrawal of 5.6 cfs. DNR also reasoned that "the extension of the permits is preferable to the issuance of certificates of appropriation, because of the complexity of the issues and the potential change in land ownership [from the Bureau of Land Management (BLM) to Calista]."

TNCC filed an administrative appeal of the decision to extend the permits. DNR denied the appeal, stating that it relied on the best available hydrologic data to make its decision and otherwise complied with its regulations. DNR conceded that there would be a net water loss as a result of the appropriation but stated that the permits would "be conditioned to determine how much water is diverted and when it is diverted." DNR amended the permits to require the collection of hydrologic data to document the flow and water level in the river and creeks and the measurement of the amount of water diverted each mining season.

TNCC appealed DNR's decision to the superior court. Contemporaneous with the filing of their opening superior court brief, TNCC filed a variety of documents to augment the record. Two of these documents were reports prepared by consultants retained by TNCC. The reports asserted that in most streams there was insufficient data to conclude that there would be no harm to fish, and that in at least some streams degradation of fish habitat was certain to occur.

After a hearing, Superior Court Judge Brian C. Shortell remanded the matter to DNR to decide whether to accept and consider the additional materials offered by TNCC. DNR decided to add eight out of ten exhibits to the administrative record, but did not amend its decision except to note that TDL had abandoned its request for water at Shovel Creek. After further briefing by the parties, in April 1993 Superior Court Judge Dana Fabe affirmed DNR's decision. This appeal followed.

---

4. ADF & G questioned the availability of 5.6 cfs in Shamrock Creek, Sabula Creek, Spruce Creek, Myrtle Creek, Rocky Creek, Shovel Creek, and Dry Creek. Additionally, ADF & G requested information regarding water flow, existing water uses, and the time water would be needed in Nugget Creek because it "has been specified as an anadromous fish waterbody ... and is known to provide spawning and rearing habitat for coho salmon."

5. ADF & G asked for information such as monthly flow duration analyses, the estimate of mean annual flow, the existing water use appropriations, if any, from the waters, and the anticipated date the need for the water would arise. TNCC claims that ADF & G never received the information.

6. TDL has since expressly relinquished its permit for Shovel Creek.

## III. DISCUSSION

TNCC raises three issues on appeal: (1) whether DNR acted outside its authority by extending the water rights permits under the circumstances of this case; (2) whether substantial evidence supported extending the water rights permits; and (3) whether DNR's extension of the permits violated article VIII, section 13 of the Alaska Constitution.[7]

### A. Standard of Review

We have not previously addressed the standard of review for a challenge of a DNR decision regarding an application for water rights. However, for cases involving preferential land rights, we have stated that we review "discretionary actions that do not require formal procedures under the arbitrary and capricious or abuse of discretion standard." *Olson v. State, Dep't of Natural Resources*, 799 P.2d 289, 293 (Alaska 1990). "This is also the federal rule." *Id.* at 293 n. 7. Under that standard

> the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be

searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (citations omitted), *cited in Olson*, 799 P.2d at 293 n. 7. We apply the same standard in reviewing state water rights decisions.

Additionally, interpreting the applicable statutory requirements for granting a permit extension does not involve agency expertise. We consequently review the issues of statutory interpretation under the substitution of judgment standard. *Longwith v. State, Dep't of Natural Resources*, 848 P.2d 257, 260 n. 5 (Alaska 1992); *Madison v. Alaska Dep't of Fish and Game*, 696 P.2d 168, 173 (Alaska 1985). We review DNR's fact findings under the substantial evidence test, requiring that DNR's findings be supported by the record. *Olson*, 799 P.2d at 294.

### B. Water Rights in Alaska

Free flowing waters in Alaska are subject to the appropriation doctrine: water

7. Although the subject permit extensions expired at the end of the 1993 mining season, we consider the merits of this appeal. Generally, we refrain from deciding questions where events have rendered the legal issues moot. *Brandon v. Dep't of Corrections*, 865 P.2d 87, 92 n. 6 (Alaska 1993) (citing *Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985)); *see Kleven v. Yukon–Koyukuk School Dist.*, 853 P.2d 518, 523 (Alaska 1993) (quoting *United States v. Geophysical Corp.*, 732 F.2d 693, 698 (9th Cir.1984) ("A claim is moot if it has lost its character as a present, live controversy.")). However, "where the matter is one of public concern and is recurrent but is capable of evading review," there is a public interest exception to the mootness doctrine. *Hayes*, 693 P.2d at 834 (quoting *Doe v. State*, 487 P.2d 47, 53 (Alaska 1971)).

The public interest exception involves consideration of three main factors:
1) whether the disputed issues are capable of repetition, 2) whether the mootness doctrine, if applied, may repeatedly circumvent review of the issues and, 3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine.... Ultimately, the determination whether to review a moot question is left to the discretion of the court.

*Id.* (citations omitted).
Here, consideration of the three factors indicates that this matter falls within the public interest exception. First, TDL has repeatedly sought and been granted extensions of its water use permits. Based on TDL's previous applications, it appears likely that it intends to continue to seek permit extensions, until its appropriation ripens into a water right. Thus, the issues addressed in the present controversy are likely to arise again, when DNR considers future extensions. Second, the last extension granted to TDL was for less than two years. Due to the complexity of various ancillary issues in this case, DNR has favored issuing shorter term permits pending their resolution. It is therefore likely that the term of future permit extensions will be completed before final appellate review occurs and thus application of the mootness doctrine may repeatedly circumvent review of the issues addressed in this appeal. Third, since a water rights permit can potentially ripen into a property right, the public interest in the common water resource is important. Moreover, due to the ripening nature of a water right, our review of the propriety of granting the permit extensions will potentially determine the viability of TDL's future water right. Therefore, although the permit extensions expired in October 1993, we consider the merits of this appeal.

may only be taken, or appropriated,[8] from a stream with permission from the State, but the first person to apply has first priority to the volume of water requested. This doctrine is reflected in article VIII, section 13 of the Alaska Constitution:

> All surface and subsurface waters reserved to the people for common use, except mineral and medicinal waters, are subject to appropriation. Priority of appropriation shall give prior right. Except for public water supply, an appropriation of water shall be limited to stated purposes and subject to preferences among beneficial uses, concurrent or otherwise, as prescribed by law, and to the general reservation of fish and wildlife.

After successfully appropriating a specific amount of water, the appropriator is entitled to a water right, a full and permanent property right in that quantity of water.

The Alaska Water Use Act, AS 46.15.010–.270, governs the appropriation and distribution of water rights in Alaska. *Doyle v. Peabody,* 781 P.2d 957, 960 (Alaska 1989). DNR's regulations elaborate on the statutory requirements. A person must file an application with DNR to obtain a water right. 11 AAC 93.040 (1994).[9] The applicant must provide information such as the specific use proposed for the water, when, where and how much water will be taken and discharged, the maximum amount to be used, and descriptions of any impoundment structures to be used. 11 AAC 93.040(c). After providing notice and an opportunity for others to file objections, DNR will issue a permit to appropriate water if issuance meets the requirements of AS 46.15.080.[10] AS 46.15.133; 11 AAC 93.080–110. DNR may place conditions on the permit which "protect the public interest," by ensuring that a quantity of water will be maintained in the stream and that proposed structures for taking the water are adequate. 11 AAC 93.120(e); AS 46.15.100.

The permit enables the permittee to construct any necessary works and to begin using the water so that he or she can qualify for a certificate of appropriation. *See* AS 46.15.110 ("A permit may place a time limit for beginning construction and perfecting appropriation."); AS 46.15.120 ("Upon completion of construction of the works and commencement of use of water, the permit holder shall notify the commissioner that the appropriator has perfected the appropriation.").

DNR may extend the permit for "good cause shown," upon "receipt of a written

---

**8.** "[A]ppropriate means to divert, impound, or withdraw a quantity of water from a source of water, for a beneficial use or to reserve water under AS 46.15.145." AS 46.15.260(1).

**9.** DNR made numerous changes to the pertinent regulations effective November 7, 1990: DNR amended 11 AAC 93.040(c), 11 AAC 93.120, and 11 AAC 92.130, and adopted 11 AAC 93.125. TDL applied in April 1990 for the permit extensions at issue. DNR issued the extensions in 1991. TNCC cited the amended regulations in support of its arguments before the agency and on appeal to the superior court and to this court. DNR cited one of the newly-amended regulations when it denied TNCC's administrative appeal. Likewise, appellees TDL and state officials have consistently cited to the amended regulations in their joint superior and supreme court briefs. No party on appeal has argued that the regulations effective November 7, 1990 are inapplicable to the issues before us.

**10.** AS 46.15.080 provides the criteria for issuing a permit:

(a) The commissioner shall issue a permit if the commissioner finds that

(1) rights of a prior appropriator will not be unduly affected;

(2) the proposed means of diversion or construction are adequate;

(3) the proposed use of water is beneficial; and

(4) the proposed appropriation is in the public interest.

(b) In determining the public interest, the commissioner shall consider

(1) the benefit to the applicant resulting from the proposed appropriation;

(2) the effect of the economic activity resulting from the proposed appropriation;

(3) the effect on fish and game resources and on public recreational opportunities;

(4) the effect on public health;

(5) the effect of loss of alternate uses of water that might be made within a reasonable time if not precluded or hindered by the proposed appropriation;

(6) harm to other persons resulting from the proposed appropriation;

(7) the intent and ability of the applicant to complete the appropriation; and

(8) the effect upon access to navigable or public water.

request from the permittee showing diligent effort toward completing the appropriation." AS 46.15.110; 11 AAC 93.120(f). DNR may also cancel the permit "if the permittee (1) does not develop and make use of the appropriation within the permit time period, or (2) as provided in AS 46.15.175, violates a term or condition of the permit." 11 AAC 93.125.

Once the permittee has demonstrated that "the means necessary for the taking of water have been developed and the permit holder is beneficially using the quantity of water to be certificated," he or she will receive a certificate of appropriation of water. 11 AAC 93.130(a)(1); AS 46.15.120. This provides the holder with a full and permanent property right in that quantity of water. The right attaches as of the date of application but may be lost through abandonment, primarily if a beneficial use is not made for a period of five years. AS 46.15.050(b); AS 46.15.140(c).

### C. Whether DNR Acted Outside Its Authority By Extending the Water Rights Permits?

■ When DNR extended the permits, it reasoned that "extension of the permits . . . [was] preferable to the issuance of certificates of appropriation, because of the complexity of the issues and the potential change in land ownership." The decision further provided:

> The permits to appropriate water will be extended through the 1993 mining season. This date corresponds with the authorization to mine issued by BLM and the NPDES permit issued by EPA. The transfer of lands selected by Calista from BLM should be completed by that date, if not sooner. Calista will then have a say in the use of its lands for mining and Tuluksak Dredging will then be required to work with Calista. It is expected that the federal mining claim held by Tuluksak Dredging will be relinquished in order to facilitate the transfer of lands to Calista.

TNCC argues that DNR was not authorized to extend the water rights permits because TDL did not demonstrate "diligent effort toward completing the appropriation" pursuant to 11 AAC 93.120(f). Specifically, TNCC contends that establishing "diligent effort" required TDL to demonstrate separate diversions from each of the streams in the Tuluksak River system.

TDL and Calista explain in their joint brief[11] that a placer mining operation requires a mining company to move equipment and build new settling ponds in order to mine different locations within the larger project area. They apparently claim that it is not feasible to work all locations within a project area in a given season, and therefore, TDL's failure to work all locations is not evidence of any lack of diligence. Further, TDL argues that it has demonstrated diligence because its "permit applications and subsequent activities constitute open steps providing notice of . . . [its] intent to secure appropriative rights on each of the permitted streams."

Alaska Statute 46.15.110 provides that "[r]easonable extensions of time shall be permitted for good cause shown." Additionally, DNR's regulation elaborates that: "Upon the commissioner's receipt of a written request from the permittee showing *diligent effort toward completing the appropriation*, the permit will, in the commissioner's discretion, be extended for a period of time not to exceed the relevant maximum time period listed in . . . this section." 11 AAC 93.120(f) (emphasis added). Therefore, we consider whether the two reasons provided by DNR— the "complexity of the issues" and the "potential change of land ownership"—constitute "good cause shown" or demonstrate a "diligent effort" by TDL as required by the statute and regulation.

We have not previously addressed "good cause" or "diligent effort" in the context of the relevant statute or regulation. However, two other state courts have discussed "good cause" in the context of extending permits.

---

11. TDL and its lessee, NYAC Mining Company, hold all mining claims within the Tuluksak Valley. All lands within the NYAC planning block are federal lands managed by BLM. These lands are presently closed to mineral entry. Calista Regional Native Corporation has selected these lands under the Alaska Native Claims Settlement Act. The transfer of these lands to Calista is pending within the BLM.

In *Kuiper v. Warren,* 195 Colo. 541, 580 P.2d 32 (1978), the Colorado Supreme Court discussed good cause to extend a permit to construct a well and appropriate water.

[T]he [Ground Water Management Act] and the [Colorado Ground Water Commission] guidelines afford appropriators the opportunity to obtain extensions upon a showing of good cause. The good cause shown provision, while not identical to the doctrine of due diligence, affords appropriators many of the same protections. Both the statutory extension procedure and the doctrine of due diligence afford appropriators, who are reasonably proceeding to complete appropriations under conditional rights, protection against loss of their rights. Designated ground water appropriators must construct their wells, place water to beneficial use, and comply with the statutory filing and time provisions or lose their right to divert.

*Id.,* 580 P.2d at 35.

In *Associated Enter. v. Toltec Watershed Improvement Dist.,* 578 P.2d 1359 (Wyo. 1978), the Wyoming Supreme Court addressed the good cause requirement for a permit extension to complete construction of a reservoir.

Thus, the sole criterion for extending these periods is whether the permittee has shown good cause for the extension. The above-quoted provision from § 41–4–506 finds its genesis in the common-law concept of due diligence which, in the context of water law, has been expressed as follows:

"... [T]he law does not require any unusual or extraordinary efforts, but it does require that which is usual, ordinary, and reasonable. The diligence, required in the prosecution of the construction of all works necessary for the diversion and application of water in an attempted appropriation of the same is that constancy or steadfastness of purpose or labor which is usual with [people] engaged in like enterprises, and who desire a speedy accomplishment of their designs ..." 2 Kinney on Irrigation and Water Rights, p. 1269.... It is basic that the determination of diligence is factual in nature and is

to be determined from the circumstances surrounding each particular case.

*Id.* at 1365–66 (citations omitted).

▮ We hold that the regulatory standard of requiring an applicant to demonstrate "diligent effort toward completing the appropriation" for a permit extension satisfies the more general statutory standard of granting an extension for "good cause shown." Therefore, DNR can extend a permit if the applicant shows diligent effort.

To obtain a finding of reasonable diligence, the holder of the right must prove continuous, project-specific effort directed toward the development of the conditional right commensurate with his [or her] capabilities. Reasonable diligence must be evidenced by reasonable progress in the development of the conditional appropriation in the most expedient and efficient manner.

*Trans–County Water v. Central Colo. Water Conservancy Dist.,* 727 P.2d 60, 64 (Colo. 1986).

DNR stated that it extended the permits "because of the complexity of the issues and the potential change in land ownership." However, DNR failed to follow its own regulation in extending the permits based on these two reasons because neither basis bears on whether TDL demonstrated a "diligent effort toward completing the appropriation" as required by 11 AAC 93.120(f). DNR extended TDL's permits for reasons alien to the regulation. Moreover, TDL also failed to demonstrate diligent effort in its extension applications. DNR should have required TDL to describe the work which had been done to perfect the appropriation, show how the water had been beneficially used, or, at a minimum, explain why no use had yet been made, and state precisely why additional time was needed. Without this information, DNR could not determine whether TDL had made a "diligent" effort warranting permit extensions. TDL could not rely on its initial applications for water rights, because they did not contain information that would have satisfied the requirements of 11 AAC 93.040. We hold that on this record DNR was not authorized to extend the permits.

### 1. TDL did not demonstrate construction of infrastructure or water use.

■ The representations TDL made in the extension applications reveal that the extension requests fail to meet the diligent effort standard. The initial permits, issued in February and June 1982 stated that TDL would construct and use bucket line dredges. The 1990 extension applications stated:

> The infrastructure including, but not limited to: airfields; road system; camp sites with complete living, working and power facilities; 2 bucketline dredges; and 1 trommel washplant are well established for support of any of our operations on the contiguous claim block and vicinity.

TNCC asserts that "these facilities have long been present in the area. For example, ... [Northland Gold Dredging's] [12] dredge was operational in 1981, since it started to destroy the river then; and the dredge at Bear Creek had been in use well before 1988." TNCC's point is apparently that TDL's statement should not be construed as demonstrating a diligent effort by TDL, the permit holder, because Northland had already established the infrastructure. Additionally, TNCC argues that regardless of who completed the infrastructure, Northland or TDL, the fact the infrastructure is established obviates TDL's need for a permit extension.[13]

TDL responds that, by nature, mining cannot be confined to one location due to the need to build settling ponds and assemble the intakes of actual diversions. TDL, therefore, suggests that this indicates that the infrastructure has not been completed and extensions are warranted. However, TDL did not provide this information in its extension applications and the agency record does not clearly reveal what TDL may have done to prepare for further operations. Thus, TDL's unsupported assertion that it needs more time to complete the infrastructure is insufficient.

TNCC further argues that since the dredges and the wash plant were available, TDL was in a position to make beneficial use of the water before the 1990 expiration of the 1986 extensions, but failed to do so.

ADF & G raised this issue with DNR regarding eight of the streams in early 1990.[14] Specifically, ADF & G questioned whether TDL had made any use of the waters, and with the exception of Spruce Creek, whether there were any present plans to mine there. DNR never responded to ADF & G.

■ TDL did not demonstrate any actual water use in its extension applications. Moreover, in many of the applications, TDL stated that mining (and its concurrent use of water) would not begin until an undetermined or vague future date, in some cases commencing after the permits' 1993 expiration date.[15] In other extension applications, TDL stated that it intended to operate in a number of the creeks in vague time frames from 1990 to 1994.[16] An applicant must actu-

---

**12.** Northland Gold Dredging mined the area in the early 1980's.

**13.** The extension application form states before the signature line, "I hereby apply for an extension of time in which to *complete* construction of the structures and begin beneficial use of water." (Emphasis added.)

**14.** The streams included: Shamrock Creek, Sabula Creek, Spruce Creek, Myrtle Creek, Rocky Creek, Shovel Creek, Dry Creek, and Nugget Creek.

**15.** In three of the extension applications, TDL stated that it had no intent to begin mining until after 1993, the expiration date of the present permits. With regard to two of those permits, TDL stated that actual operations will await suitable economic conditions. Additionally, two applications stated that TDL "may opt to wait on extracting these reserves until ... [they] are working in that vicinity, in 1994 or 1995." One application stated, "It is anticipated that we will begin extracting those reserves in 1995. The exact timetable is dependant on the business strategy of mining the reserves on the whole contiguous claim block." Further, one application stated, "We have no present plans to develop these lode deposits ourselves but we are presently marketing their development [sic] and the continuation of the present water permit is valuable for that purpose."

**16.** The applications for Bear Creek, Bonanza Creek, Spruce Creek, and California Creek provided that TDL intended to operate in 1990 and 1991. The application for claim # AA30710 stated that TDL planned to operate in 1991. Some time thereafter, TDL would mine Granite Creek and Dry Creek. Another application provided

ally do something during the term of the permit to demonstrate diligence; a statement of intent cannot suffice. *City of Denver v. Northern Colo. Water Conservancy Dist.,* 130 Colo. 375, 276 P.2d 992, 1003–04, 1008 (1954). *See also Trans–County Water,* 727 P.2d at 64 (citing *Orchard Mesa Irrigation Dist. v. City of Denver,* 182 Colo. 59, 511 P.2d 25, 28 (1973) ("to prove due diligence, there must be concrete efforts to finalize the appropriation; a vague hope to use the water someday is insufficient")).

■ In its decision on appeal, DNR responded to TNCC's assertion that there was no evidence that the mining operation had used water during the past five years by stating that it "[found] evidence in the administrative record that water use ... [had] occurred." DNR, however, did not specify what that use was or which streams had been used. TDL's applications failed to demonstrate that TDL had made any beneficial use of the water between 1986 and 1990, or that it intended to do so absent another extension. The record does not clearly indicate what use TDL made of the water before the 1986 extensions expired in 1990. The record does contain information that might have supported findings that TDL operated a wash plant at California Creek and Rocky Creek in 1987–89. The record suggests less clearly that the valley floors were dredged as recently as 1987, but does not specify where any such operations occurred. DNR made no specific findings about what beneficial use of water TDL made while the 1986–90 permits were in force, and made no findings about how any water use at particular sites might have justified extending the permits at all the sites.[17]

2. *Diligent effort can be shown on a project instead of on each individual stream.*

■ TDL contends that its placer mining operation is a single project, therefore, it need not perfect an appropriation from each stream to show diligent effort. TNCC argues that a showing of diligence must be made for each particular stream, claiming that the Colorado Supreme Court expressly rejected an argument identical to the one TDL makes here.

Although in *City of Denver v. Northern Colo. Water Conservancy Dist.,* 130 Colo. 375, 276 P.2d 992, 1000 (1954), the Colorado Supreme Court concluded, "The priority of appropriation which gives the better right under [the Colorado] Constitution is a priority on a stream rather than on a project," the facts in that case are distinguishable from the dispute before us. The *Denver* court listed the following considerations: (1) whether streams within a project are confluent with a main water body or somehow physically connected; (2) whether the permittee seeks to divert water from an "entirely separate drainage basin;" (3) whether the water appropriation on one water body was surveyed and planned years later than the other projects; and (4) whether appropriation on part of the project would directly affect other claimants who are "protestants [in that part of the project] but not directly affected by [the other] projects." *Id.* Thus, the court implicitly acknowledged that a demonstration of diligent effort on a stream within a project can conceivably suffice to show diligence throughout. Applying those guidelines in the instant case would support a conclusion that the fifteen permitted streams are part of a larger project: (1) the disputed permits are for the Tuluksak River and its

that TDL "would likely move onto those reserves in 1992." One application stated that "Shamrock Creek is one of our optional sites for the Trommel Washplant beginning as early as 1992 or 1993." The application for Sabula Creek provided that TDL anticipated on extracting those reserves in 1993 or 1994.

**17.** Our analysis of this issue highlights the point that the permits in question here are essentially blanket permits authorizing water to be taken at any point along more than forty miles of stream. By contrast, the regulations applicable to appli-

cations for water rights are site specific, requiring designation of the point of water withdrawal and the point of discharge back to the stream. 11 AAC 93.040(c)(3). No applications conforming with the degree of specificity required by the regulations appear in the record. The parties do not directly address whether blanket permits to appropriate water are authorized by statute. It is clear, however, that the regulations concerning permit applications do not contemplate blanket permits.

tributaries; (2) all diversions are from two connected drainage basins within a defined area of operation; (3) TDL's mining and water use plan has always included each of the permitted streams; and (4) the "protestants" here claim to be directly affected by TDL's operations on each of the permitted streams. However, in light of TDL's failure to demonstrate diligent effort for any of the streams, we cannot extend the finding to the entire project. Consequently, we need not determine on how many individual streams [18] a permittee must demonstrate diligent effort to demonstrate diligence on a project.

In sum, TDL did not show a diligent effort in making a water appropriation in its permit extension applications. DNR made no explicit or implicit findings of diligent efforts, but rather, granted the extensions based on the alleged complexity of the issues and a prospective change in ownership of the land. Neither reason bears on whether TDL demonstrated a diligent effort to complete its water appropriation on any stream. DNR's rationale for extending the permits, therefore, is not related to the diligent effort criterion contained in 11 AAC 93.120(f). We conclude that DNR acted arbitrarily in extending the permits, thereby abusing its discretion.

D. *Whether DNR Had Substantial Evidence To Extend the Water Rights Permits?*

TNCC asserts that DNR's decision to extend the permits is not supported by the record. Specifically, it argues that (1) DNR lacked any basis to conclude that adequate water would be available for appropriation; (2) DNR did not have substantial evidence to support the amount of water granted for mining operations; (3) DNR did not consider that the method of placer mining had changed; and (4) DNR did not adequately address TNCC's concerns regarding water quality, navigation, or fish and wildlife.

1. *DNR had adequate data to estimate stream flows and thereby determine that TDL could appropriate 5.6 cfs.*

■ TNCC contends that DNR did not have the necessary data to determine wheth-

er TDL should be able to appropriate 5.6 cfs from each of the fifteen streams. TNCC relies on two letters, one from Barry Hecht of Balance Hydrologics, Inc. and one from Lawrence Wise of Entrix, Inc., which express opinions that DNR erred in concluding that there was sufficient water to meet the requirements of TDL's mining operations while also protecting fish habitat.

DNR contends that the permit extensions were based upon the best available data, and the information subsequently submitted by TNCC did not contradict DNR's data. DNR asserts that its decision is supported by adequate hydrologic data, relying on the memorandum by its hydrologist, Mark Inghram. DNR also notes that in approving TDL's appropriation of 5.6 cfs it relied on ADF & G's memorandum which stated that it had no objection to the issuance of the water right because the "withdrawal will not adversely affect fish or wildlife ... if conducted according to an approved plan of operations."

DNR's regulation provides that an application for a water right must include "a description of the mean annual flow, or mean monthly flow if available, using the best available data, or, if data are not available, an estimate of mean annual flow using acceptable hydrologic methods." 11 AAC 93.040(c)(14). Thus, TDL's requested water appropriation of 5.6 cfs must be based on the best available data or an estimate using acceptable hydrologic methods to estimate mean annual or monthly flows.

Essentially, TNCC wants us to attach more importance to the methodology and conclusions of Hecht and Wise than to the methodology and conclusions of DNR's expert. TNCC's expert, Hecht, used the U.S. Geological Survey's standard procedure for estimating flows in ungauged waterbodies in southwestern Alaska and estimated stream flows based on the Kisaralik basin to the south of the Tuluksak area. Hecht challenged Inghram's "use [of] an average flow for the June through October period as the basis for evaluating water availability since flows vary so much over the course of the

---

**18.** This assumes blanket rather than point specific permits are lawful. *See* note 17, *supra*.

summer."[19] Hecht suggested that DNR should use a minimum flow instead of a mean flow.

TNCC's other expert, Wise, used the Tennant Method for determining instream flow requirements for the maintenance of fish habitat.[20] To maintain "excellent" fish habitat, Wise recommended that flow diversions not exceed fifty percent of the average annual rainfall of any individual tributary and the sum of the withdrawals should not exceed fifty percent of the average annual flow of the Tuluksak River. Wise opined that, using the Tennant Method and Inghram's flow estimates, TDL could withdraw 5.6 cfs and maintain "excellent" fish habitat in most of the streams. However, he asserted that Shovel Creek did not contain enough water to withdraw 5.6 cfs, and diverting such an amount on Rocky and Spruce Creeks would result in "fair to degrading" and "poor or minimum" habitat, respectively.

DNR and its hydrologist considered the information presented by Hecht and Wise in its decision on remand. Based on information provided by Hecht, Inghram revised his original flow estimates in eight tributaries to the Tuluksak River, finding that greater than 5.6 cfs of water existed in all but Shovel and Spruce Creeks. DNR concluded that the differences between Inghram's estimates and those of Hecht are roughly nine percent, which "represents corroborating values." As a result of Wise's assertion that there would be inadequate flow in Shovel Creek, TDL agreed to relinquish its permit to appropriate water from Shovel Creek for mining. DNR maintained, however, that Rocky and Spruce Creeks "have the water necessary for mining; and, since the water is required to be returned to those creeks, flows necessary for fish habitat would be maintained at a level that would be considered 'excellent' to 'outstanding' under the Tennant Method."[21] After reviewing the documents submitted by TNCC, DNR adhered to its decision to issue all permit extensions except for Shovel Creek.

No recorded data exist for the exact stream flows of the Tuluksak River and its tributaries. Consequently, DNR needed to extrapolate that information to determine how much water was available for appropriation. DNR considered the estimates of its hydrologist, Inghram, and those of Hecht and Wise, provided by TNCC ten months after DNR decided to extend the permits. DNR concluded that an appropriation of 5.6 cfs was justified in all streams except Shovel Creek, for which TDL subsequently relin-

---

**19.** In the absence of any measurements or useful estimates, Inghram estimated flows in the affected creeks by "analogy to the nearest gaged basins of similar size, which are in portions of Southwest Alaska." Hecht challenges the analogy on the basis that the area used had much greater precipitation.

**20.** The Tennant Method requires the calculation of the average annual flow, and then assesses the effect of removal of flow on the habitat of aquatic animals by determining the percentage of average annual flow remaining in the stream. This method assigns habitat quality values for different flow regimes during different parts of the year.

**21.** Christopher Estes, Statewide Instream Flow Coordinator for ADF & G, stated that Wise incorrectly applied the Tennant method. Estes stated that the Tennant method "should be combined with an evaluation of mean daily flow, monthly flow, and other hydrologic characteristics particular to the water body under investigation, whenever these data are available or can be estimated." Estes concluded that Wise did not include estimates of mean annual flow for each tributary and instead based the analysis on a mean monthly flow estimated by combining mean monthly flows for June through October which may not reflect the flow variability available for fish and other uses during individual months. Additionally, he claimed the analysis contained no fish periodicity data, "without which it is not possible to assess the quality of, and need for, the recommended instream flow requirements to sustain fish habitat."

Wise stated that he used a modified Tennant method in response to having only Inghram's flow estimates with which to work. He justified the use of the average flow from June through October as more realistically reflecting the stream conditions during the spawning season than would the use of the average annual flow. Regarding periodicity, Wise responded that his analysis did consider the timing of life history activities of salmon. Furthermore, Wise explained that using the standard Tennant method results in lower flow recommendations which may not provide full protection for spawning fish, therefore, using the modified Tennant method results in a "conservative estimate of the amount of flow needed to protect important fishery resources of the Tuluksak River tributaries."

quished its permit. Although DNR ultimately maintained its decision to extend the permits, it modified its analysis of flow estimates. We conclude that DNR's determination that TDL could appropriate 5.6 cfs based on the estimated stream flows in all streams except Spruce Creek is supported by substantial evidence.

■ Despite its own hydrologist's estimate of only 4.6 cfs stream flow in Spruce Creek, Hecht's estimate of 3.6–4.2 cfs, and Wise's assertion that withdrawal of 5.6 cfs would result in "poor or minimum" fish habitat, DNR granted TDL the permit extension to appropriate 5.6 cfs in Spruce Creek. Therefore, DNR's extension for Spruce Creek was not supported by substantial evidence.

2. *The record does not support a grant of the amount of water TDL requested and DNR granted.*

TNCC also argues the permit extensions are invalid because they allow TDL to take more water than it needs. TNCC argues that since TDL uses settling ponds to recycle 100% of the water, TDL does not need 5.6 cfs of water once the settling ponds are filled. TDL explains that despite its recycling program, it is necessary to divert water from the streams because of water loss (by evaporation and infiltration under normal conditions and when the operation stops for a protracted period) and the potential need to fill settling ponds which may be built when TDL moves the wash plant. TDL notes that while 5.6 cfs is the flow rate to which it requires access in order to guarantee sufficient water for its ongoing operations, TDL will not, in fact, divert 5.6 cfs twenty-four hours a day.

■ The pertinent DNR regulation states that an application for a water right must include "a statement of the quantity of water requested, with documentation and calculations justifying the request."[22] 11 AAC 93.040(c)(13). The record contains no documentation and calculations from TDL justifying its request for 5.6 cfs.

■ On December 22, 1986, DNR amended the amount of water to be appropriated to 5.6 cfs (from the previously permitted levels of 6 cfs and 7 cfs) in each of the permits, apparently on its own initiative, without supplying its reasons for doing so. DNR initially granted TDL 6 cfs and 7 cfs for two permits which covered large areas. DNR's initial grant can be fairly interpreted to have permitted TDL a *total* appropriation of 13 cfs for the two permitted areas, not 6 cfs and 7 cfs for each tributary within the permitted areas. The latter interpretation would potentially result in a cumulative total appropriation much greater than 13 cfs for the initial two permits. Therefore, when DNR split the initial two permits into fifteen permits, allowing 5.6 cfs to be appropriated for each permitted stream, DNR allowed TDL to appropriate a total of approximately 84 cfs. By doing so, DNR improperly amended the permitted appropriation amounts.

■ Additionally, TDL has not supported its claimed need for 5.6 cfs. TDL broadly asserts that "[t]he ongoing flow rate necessary to guarantee operation of TDL's mining equipment is 5.6 cfs," explaining that 5.6 cfs is needed to replenish water loss in settling ponds due to evaporation, seepage, cessation of operation, or moving the wash plant.[23] This assertion is not supported by facts in the record. No logical or self-evident reason explains why that amount of water is needed to fill or refill a settling pond; TDL could, for example, fill the pond at a slower rate or pump from the shallow ground water adjacent to ponds. Furthermore, other than asserting that 5.6 cfs is the flow rate to which it

---

22. Although 11 AAC 93.040(c)(13) speaks directly to an application for a permit, we believe that this requirement also applies to permit extensions. Because a permit extension concerns the terms and conditions of the permit and thereby the amount of water requested, DNR should require an applicant for a permit extension to provide the quantity of water requested, with documentation and calculations justifying the request. This is especially true where the information supporting the initial permit fails to satisfy the regulation or where the terms in the extension permit differ from those approved in the initial permit.

23. TNCC disputes TDL's assertion that the settling ponds will lose water, and instead, asserts that the ponds will gain water. TNCC points to TDL's ADF & G permit which specifies how TDL is to deal with "settling pond overflow water."

requires access, TDL fails to demonstrate why such an amount is necessary.[24] Therefore, DNR's grant of 5.6 cfs lacked a substantial basis in the record.

3. *DNR should have considered the change in the nature of the water use from a dredge operation to a wash plant.*

■ TNCC claims that the water use has changed, and therefore that the amount of water to be appropriated should reflect this change. TNCC contends that the original permits approved the operation of a bucket line dredge, which required 6 and 7 cfs to operate. In December 1986 DNR amended the appropriation per stream to 5.6 cfs; DNR retained that amended figure through the disputed extensions. However, DNR found that from 1987–90 TDL used wash plants which apparently require more water than bucket line dredges. TNCC argues that this is a substantial change in the way the water was used, and therefore that, DNR should not have extended the 5.6 cfs allocation without further analysis.

TDL responds that "[t]he fact that ... [it] has gone from a dredge to a wash plant operation does not change the type of beneficial use involved: placer mining. Only the type of *equipment* used has changed." The DNR Director responded similarly to TNCC's position on this point: "While the type of operation for mining has changed from dredging to a wash plant, I find that using water for placer mining has not changed."

TNCC counters that the beneficial use is not "placer mining," but instead "placer mining by wash plant" rather than "placer mining by dredge." We agree. The issue is not the general purpose of the appropriation, but the requisite amount of water for the specific project involved. DNR requires a water right applicant to describe the "nature of the water use." 11 AAC 93.040(c)(9). The nature of the water use changes if a mining company employs a significantly different mining method that requires a different quantity of water. If TNCC was correct in asserting that a wash plant uses different amounts of water than a dredge, TDL should have been required to seek amended permits reflecting an adjusted limit on the amount to be appropriated. If TNCC was correct, TDL also should have been required to provide "a statement of the [new] quantity of water requested, with documentation and calculations justifying the request." 11 AAC 93.040(c)(13). DNR did not decide whether TNCC was correct; it only considered that the basic use, placer mining, was unchanged. DNR should have considered whether the two different methods of mining, in fact, require different amounts of water. Not having conducted that analysis or answered TNCC's argument, DNR should not have extended the 5.6 cfs allocation. The record does not appear to contain facts that would have supported a finding the two types of operations use identical amounts of water (had DNR made such a finding) and it certainly does not contain facts that are so convincing that they render harmless DNR's failure to decide that issue.

4. *DNR adequately addressed TNCC's concerns regarding water quality and navigation, but failed to do so regarding fish and wildlife.*

TNCC argues that DNR did not adequately address TNCC's concerns regarding water

---

24. TDL argues in support of its allowed diversion of 5.6 cfs: "TDL's application for the wash plant operation requested 3,000 gallons per minute, or roughly 6.7 cfs. Since the application established that mining did not run into November, DNR decreased the allowable diversion to 5.6 cfs accordingly, to reflect June–October usage."

TDL fails to explain why it initially needed 6.7 cfs. Additionally, TDL does not explain why the fact that November was not part of the mining season justified DNR's approval of 5.6 cfs. Further, TDL's statement that its application for the wash plant operation established that mining did not run into November is not found in the application. As TNCC points out, TDL's attempted justification makes no sense. "The amount taken from a stream reflects the amount to be taken at a given time, not an average throughout the mining season. Moreover, flows in November obviously are going to be far lower than in the summer, due to freeze-up, which means that June–October usage will be *higher* than June–November usage."

DNR granted TDL 5.6 cfs without either an explanation or a justification in the record as to why that amount is necessary for TDL's mining operation. Possibly facts exist which would have supported a permit of 5.6 cfs, but the record does not contain them and DNR does not describe them.

quality, navigation, and fish and wildlife. DNR responds that TNCC supports this claim with opinions which are not probative of harm attributable to TDL's permitted activities.[25]

DNR may not issue a permit unless doing so is in. the public interest. AS 46.15.080(a)(4). In making this determination, DNR shall consider the impacts of water appropriation on fish and game resources, public health, and access to navigable water. AS 46.15.080(b)(3), (4), (8). DNR's regulation provides that "[a] permit extension ... will, in the commissioner's discretion, be subject to additional conditions that the commissioner considers necessary to protect prior appropriators and the public interest." 11 AAC 93.120(g). Therefore, DNR must consider the public interest in determining whether to extend permits, specifically considering the impacts on water quality, navigation, and fish and wildlife. AS 46.15.080(b); 11 AAC 93.120(e)(2) & (g).

### a. *Water quality concerns*

■ DNR's decision to extend the permits discussed water quality:

> The biggest concern expressed in the objections to this project and in the public hearing concerned water quality. This issue is hard to get a handle on due to the fact that there is no baseline data prior to mining, and the water quality work done to date has been geared towards turbidity and sediment. The USF & WS has a draft report out on the impacts of placer mining on the Yukon Delta National Wildlife Refuge. The conclusion states that no evidence was found that mining activities have adversely impacted the Tuluksak River's water quality or fish population.[26] However, the report goes on to say that

river sediment in and below mining operations appear to be accumulating heavy metals. It is hypothesized that alterations in specific water quality parameters, such as PH, could release the heavy metals and trace elements found in sediment to the Tuluksak River. The report does not demonstrate that water quality has been affected by the mining to date, but speculates that the Fog River and Otter Creek significantly influence the lower Tuluksak River's chemical characteristics. Neither of these streams have been mined in the past.

The report suggested that the current studies be continued with additional, and more extensive monitoring, on a regular schedule. BLM, in their Environmental Assessment (EA) states that, "No impact to the water quality of the Tuluksak River watershed is expected from the mining operation, because there are no planned diversions of surface water or direct discharges of processed water to the Tuluksak River. All surface and ground water intercepted in the mining areas will be collected and recycled into the operational water supply or treated to state and federal standards before discharge."

The wash plant used in this mining operation has consistently met state and federal water quality standards during the last six years of operation, according to DEC and BLM. Monitoring by the federal and state agencies has not identified any contaminants in the Tuluksak River system, which might be attributed to the mining or its support activities (BLM's EA).

DNR relied on the reports of various agencies in concluding that the Tuluksak River meets state water quality standards. DNR

---

25. A number of villagers testified at the DNR hearing as to how mining affected the Tuluksak River, noting the decline in water quality, water levels, and the number of fish.

26. The November 1990 USF & WS report provides:

> Limnological information and analytical data collected during non-mining periods indicate that the Tuluksak River's water quality meets state water quality standards. No sediment levels exceeded Service-derived criteria; how-

ever, sediment collected in, and downstream of, mined sites contained significantly greater concentrations of trace elements and heavy metals than those levels found in control samples. Total metals concentrations in fish collected from mining-influenced sites were not significantly greater than those fish samples collected from control sites. Furthermore, concentrations in fish were below Service DRAFT tissue criteria associated with expected environmental impacts.

provided conditions regarding water quality on the permit extensions:

> Per AS 46.030.050, [sic] Any discharge to state waters made subsequent to these water appropriations shall comply with the Alaska Water Quality Standards. This may require the installation and maintenance of settling ponds or similar systems to reduce turbidity and settleable solids in the discharges.
>
> . . . .
>
> All operations will be conducted to prevent degradation of natural water courses or systems. Processed water will be recycled and any overflow will be treated to state and federal standards before discharge. All surface waters within the state of operations will be subject to treatment before discharge.

Although DNR could have been more specific in the conditions it imposed regarding water quality,[27] TNCC fails to demonstrate that DNR did not comply with state water quality standards. Thus, DNR did not abuse its discretion.

### b. Navigation concerns

 During the public hearing at Tuluksak, villagers testified that navigability on the river had decreased. DNR's decision found that navigability would not suffer from issuance of the permits because mining did not reduce the overall flow of the river since there would allegedly be no net loss of water.[28] TNCC claims that DNR's decision ignored the villagers' testimony and is, therefore, unfounded.

Although we acknowledge the sincerity of the villagers' opinions that mining will necessarily degrade the Tuluksak River, TNCC failed to document how TDL had negatively impacted navigability on the river and its tributaries.

### c. Fish and wildlife concerns

 The Tuluksak River provides important habitat for salmon and is relied upon as a subsistence and commercial fishery. The Tuluksak River system contains "one of the major salmon spawning streams in the Kuskokwim River drainage." A loss of salmon production in the Tuluksak River will impact the Village of Tuluksak's subsistence fishery. Additionally, the Tuluksak River is a major contributor to the Kuskokwim River commercial fishery.

27. USF & WS noted in its report that "placer mining in Alaska, in general, has had a history of non-compliance with water quality standards and there is little evidence that the existing situation is likely to improve soon." Consequently, USF & WS recommended, at a minimum, including the following parameters in future monitoring plans:

| | |
|---|---|
| settleable solids | turbidity |
| alkalinity | hardness |
| conductivity | temperature and pH |
| dissolved oxygen | suspended solids |
| total arsenic in water | dissolve metals in water |
| total metals in sediment | mercury in fish tissue |

28. DNR's decision stated the following about navigation:

> The navigability of the Tuluksak River has changed over time. Sand bars have been created at its confluence with the Kuskokwim River due to sediment deposits. Some of this sediment originated from the Tuluksak River and its tributaries. It is not possible to determine if this impact is due to past mining practices prior to 1985, but it is evident that a majority of sediment transported by the Tuluksak River comes through natural means, such as bank erosion. In the BLM environmental assessment for this mining project, it states that, "During periods of high flow, water clarity degrades slightly in the upper valley, but clarity may fall off sharply in the lower river due to accelerated bank cut and slumping of silt rich soils."
> The largest source of sediment within the Tuluksak River comes from the Fog River, a tributary to the Tuluksak River. The Fog River has never been mined, and the turbidity and sedimentation processes occurring are natural. In some areas of past dredging, surface water flow is temporarily lost to intertailing flow. This is evident on California Creek, which does not have a continuous surface water flow to the Tuluksak River. This break in flow was caused by the 1955 dredging, which placed a strip of tailings across the valley mouth. In other areas, dredging adjacent to stream channels has caused a reduced surface flow as water is flowing through the tailings, and not at the surface.

TNCC argues that DNR did not adequately address TNCC's concerns regarding fish and wildlife. Villagers testified that there are fewer fish in the river than before mining began. Additionally, TNCC submitted Wise's report, stating that fish need at least fifty percent of the stream flow to have "excellent" fish habitat. TNCC also expresses its concern that stream segments may become dewatered when the return point of recycled water is downstream from the appropriation point, thereby significantly depleting fish spawning and rearing habitats and preventing passage of fish upstream or downstream at key life stages.

TNCC's concern about the potential for dewatering has merit. A permit applicant must provide "a legal description of the point of withdrawal, diversion, or impoundment; the point of water use; and, if water is to be returned to a stream or water body, the point of discharge." 11 AAC 93.040(c)(6). Neither TDL's original applications nor its extension applications indicate precisely the points where the water will be diverted and then returned to the streams. Consequently, it is difficult to determine where a stream may potentially become dewatered. DNR failed to place any conditions on the permits concerning the distance between the point of appropriation and the point of return. *See* 11 AAC 93.120(e)(2)(A) (providing that DNR may include conditions to maintain a specific quantity of water at a given point to protect fish and wildlife) & 11 AAC 93.120(e)(2)(B) (providing that DNR may include conditions that include the approved location of points of withdrawal and return flow). 11 AAC

93.120(e)(2) gives DNR the authority to include conditions which would have potentially protected fish and wildlife. DNR's decision granting the permit extensions contained one condition regarding fish and wildlife: "Operations will be conducted in a manner to minimize wildlife species disruption and habitat destruction. Reclamation will be designed, to the extent practicable, to enhance wildlife habitat diversity and productivity."

 11 AAC 93.120(e)(2) gives DNR the authority to include conditions which protect fish and wildlife. Because TDL's extension applications failed to reveal the location of the points of appropriation and return, DNR should have conditioned the permits. DNR might have cured any deficiency in the applications by imposing stringent limitations on dewatering and by requiring that operations cease or be reduced to maintain adequate streamflow for fish and wildlife. The sole condition DNR imposed regarding fish and wildlife is too vague to ensure protection of the salmon habitat from dewatering. Because DNR did not incorporate any specific condition regarding dewatering, it abused its discretion in granting extensions in response to deficient applications.[29]

## IV. CONCLUSION

We hold that DNR acted outside its authority in extending the water rights permits because TDL did not show "diligent effort toward completing the appropriation" as required by 11 AAC 93.120(f). We conclude that DNR had adequate data to estimate stream flows. We conclude that the amount

The overall flow of the Tuluksak River has not been decreased due to mining, and surface water quantity below these mining sites has not been altered. The same historical volumes of water are available downstream from the mining project due to the nonconsumptive nature of placer mining.

**29.** TNCC also argues that DNR violated article VIII, section 13 of the Alaska Constitution by extending TDL's permits because DNR did not reserve enough water to support fish and wildlife. However, we find it necessary to abstain from reaching constitutional issues unless essential to a decision in the case. *See Municipality of Anchorage v. Anchorage Daily News*, 794 P.2d 584, 594 n. 18 (Alaska 1990) (declining to reach broader constitutional issue when civil rules con-

stitute sufficient device for controlling discovery harassment); *State v. F/V Baranof*, 677 P.2d 1245, 1255 (Alaska) (not addressing constitutionality of statute since owners were afforded due process), *cert. denied*, 469 U.S. 823, 105 S.Ct. 98, 83 L.Ed.2d 43 (1984); *Zerbe v. State*, 578 P.2d 597, 598 (Alaska 1978) (not addressing constitutional issue because of disposition of first point on appeal), *overruled on other grounds, Stephens v. State, Dep't of Revenue*, 746 P.2d 908 (Alaska 1987); *Puller v. Municipality of Anchorage*, 574 P.2d 1285, 1288 (Alaska 1978) (not reaching constitutional issues in light of construction of statute); *State v. City of Anchorage*, 513 P.2d 1104, 1112 (Alaska 1973) (reaching constitutional issue unnecessary after interpreting statute); *Anniskette v. State*, 489 P.2d 1012, 1016 (Alaska 1971) (not reaching broader question of statute's

of water TDL requested is not supported by the record. We conclude that DNR did not abuse its discretion in determining that the permit extensions adequately addressed water quality and navigation concerns; however, we conclude that DNR abused its discretion by failing to address fish and wildlife concerns adequately.

Accordingly, we REVERSE DNR's decision to extend the permits and REMAND to DNR. If TDL wishes to pursue the extensions, DNR must order TDL to file a proper application for a permit for each stream for which TDL intends to use water in the definite future, providing a justification for the

amount of water each operation would require, and demonstrating diligent effort and how water was beneficially used during the prior extensions that expired in 1990. Applicants seeking permits or extensions are not necessarily in the best position to make determinations potentially affecting fish and wildlife. Consequently, if DNR decides to issue permits, we urge it to consider including conditions requiring maintenance of specific minimum quantities of water in specified stretches of stream and specifying the points of withdrawal and return.

constitutionality since conduct protected by constitution) (cited with approval in *Marks v. City of Anchorage,* 500 P.2d 644, 647 n. 9 (Alaska 1972)). Because we hold that DNR erred in

extending the permits pursuant to the applicable regulations, it is not essential to the resolution of the case to decide the constitutional issue.