STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES, Appellant,

v.

GREENPEACE, INC., and BP Exploration (Alaska) Inc., Appellees.

No. S–10409.

Supreme Court of Alaska.

June 18, 2004.

Rehearing Denied June 18, 2004.

Robert C. Nauheim, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellant.

Nancy S. Wainwright, Law Offices of Nancy S. Wainwright, Anchorage, for Greenpeace, Inc.

Jeffrey M. Feldman, Susan Orlansky, and Ruth Bostein, Feldman & Orlansky, Anchorage, for BP Exploration (Alaska) Inc.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Greenpeace, Inc. argues that the State of Alaska deprived Greenpeace of due process when the state lifted its stay of a temporary water use permit on one day's notice. The public interest exception justifies our consideration of the due process issue although it is technically moot. We hold that although lifting the stay on one day's notice denied Greenpeace a fair opportunity to be heard, its subsequent opportunity to litigate both the lifting of the stay and the permit's merits cured this violation of due process. We therefore reverse the superior court decision that held to the contrary.

### II. FACTS AND PROCEEDINGS

In August 1999 BP Exploration (Alaska), Inc. (BPXA) applied for a temporary water use permit (TWUP) to remove seventy million gallons of water from the Lower Kuparuk River or adjacent watershed during the winter of 1999–2000. The water was to come from the Seal Island Mine site, a gravel pit next to the Lower Kuparuk River, that fills each year during the spring flood of the Kuparuk River delta. During the winter construction season the gravel pit has little, if any, hydrological connection to the Kuparuk River. The application stated that the water would be used for ice road construction to support BPXA's Northstar project. BPXA also applied to the Alaska Department of Fish and Game (ADF & G) for a fish habitat permit under AS 16.05.870(b). ADF & G issued the fish habitat permit but limited the water withdrawal to fifty-six million gallons. In reviewing the application, ADF & G con-

cluded that the permitted water withdrawal during the winter would remove fifteen percent of the available water under the ice and that an adequate amount of water would remain for the fish and their habitat. The Alaska Division of Governmental Coordination reviewed BPXA's application for the TWUP for consistency with the Alaska Coastal Zone Management Program. It found that the proposed permit was consistent with coastal zone policies concerning fish habitat. Following these two findings, the Water Resources Section of the Division of Mining, Land and Water of the Department of Natural Resources (DNR) issued TWUP A00–10 to BPXA on December 16, 1999, permitting water withdrawals from the Kuparuk site totaling up to fifty-six million gallons. The permit was to expire July 1, 2000.

On January 14, 2000 Greenpeace appealed the decision to issue TWUP A00–10. Its appeal asked that TWUP A00–10 be revoked "because of the irreparable harm appellant has suffered and is suffering to its due process rights, and the actual irreparable physical harm occasioned by the adverse impacts to coastal resources and water resources from the unauthorized and the approved water use by BPXA." Greenpeace moved for expedited consideration. At that time 11 Alaska Administrative Code (AAC) 02.060(a) (1991) provided for an automatic stay of a permit decision when a party appealed the permit's issuance.[1] DNR therefore stayed its decision to issue the permit, but on January 27 BPXA filed a motion asking the division director to lift the stay; BPXA also asked that its motion be given expedited consideration. On January 27 DNR left a telephone message for Greenpeace's representative informing him that Greenpeace had one day to oppose BPXA's request to lift the stay. The representative was out of town and did not receive the message for several days. BPXA certified that it served Greenpeace by delivering a copy of BPXA's request to lift the stay to Greenpeace's office on January 27. The division director and the DNR commissioner lifted the stay on January 28 by decision issued that day.

On February 7 Greenpeace requested reconsideration of the decision to lift the stay. Its request stated:

[t]he limited time within which Appellant has to submit information, and the fact that Appellant has not yet been able to review the administrative record in this appeal means that Appellant cannot submit necessary additional information until access to the administrative record is granted, and until Appellant's hydrologist can review the records of DNR.

On February 25 the commissioner denied reconsideration of the decision lifting the stay. His denial stated that "Greenpeace provides no evidence that there is any actual imminent risk or threat to fish and wildlife posed by the lifting of the stay," and that Greenpeace relied on "unsubstantiated allegations" without providing "any new information." The denial letter also granted Greenpeace's request for additional time to review the administrative record as well as access to that record.

On March 28, 2000 Greenpeace appealed the commissioner's denial to the superior court. Greenpeace also filed a motion asking the superior court to stay DNR's decision to lift the automatic stay pending the court's review of the merits of the appeal. Greenpeace claimed, among other things, that in lifting the stay DNR had denied Greenpeace due process and improperly failed to apply the criteria of AS 46.15.080. On May 4 BPXA notified the division director and the commissioner that it would no longer need the permit after May 8, because the winter construction season had ended; it also stated that it therefore had no objection to reinstating the stay on May 8. The commissioner

---

1. The regulation also gave the commissioner and the director the authority to lift an automatic stay if the commissioner or the director determined that public interest required it. 11 AAC 02.060(a) (1991). Former 11 AAC 02.060(a) provided:

Timely appealing a decision within the department in accordance with this chapter stays the decision during the department's consideration of the appeal or request for reconsideration unless the director or commissioner, in his or her discretion, decides that the public interest requires that the decision or any part of it should take effect on the date stated in the decision or, if that date has passed, on a date set by the director or commissioner.

withdrew his decision lifting the stay as of May 9, and on May 5 DNR and BPXA notified the superior court that it need not rule on Greenpeace's motion to stay the lifting of the stay. On May 8, 2000 the superior court decided that the motion to stay was moot. The court later characterized that decision as denying the motion and noted that TWUP A00–10 expired on July 1, 2000. This was the permit's original expiration date.

In July 2000 the commissioner and the division director entered their final decision on Greenpeace's appeal of the underlying decision to issue the permit. They determined that the permit appeal was moot but nonetheless addressed the merits:

> Greenpeace does not allege any actual harm to the aquatic environment of the Kuparuk River. Nor does it provide any evidence of environmental harm. Instead, its argument is that the Department has not taken a sufficiently detailed look at the potential for environmental harm. These contentions are without merit.

> As a preliminary matter, the water use permit does *not* authorize withdrawal of water from the Kuparuk River. It authorizes temporary water use from a gravel pit near the Kuparuk River. This gravel pit fills with water during spring and summer high flow events of the Kuparuk River. Division staff have determined that source of water covered by the permit has no appreciable hydrologic connection to the Kuparuk River during winter—the period of water withdrawal and construction activity. Thus, Greenpeace's allegations concerning the potential for adverse impact upon the fish and wildlife in the Kuparuk area are misplaced.

> It should also be noted that the Department of Fish and Game (ADF & G), the state agency with primary responsibility for fish and game management in Alaska, has expressly approved the water withdrawal authorized by TWUP A00–10 in Title 16. To the extent Greenpeace believed that the ADF & G permit was legally deficient in some respect, it could have sought to appeal that decision. It has chosen not to do so. The Department must be able to rely on unchallenged findings of its sister agencies charged with responsibility to manage state resources. It must also be able to rely on the expertise of that agency concerning the resources it manages. Greenpeace['s] appeal[ ] of the Division's issuance of a temporary water use permit on the grounds that it has not sufficiently considered the potential impact [on] fish and wildlife habitat disregards this necessary division of administrative responsibility. As both a practical policy matter, and a legal matter, the Department has no reason to question ADF & G's approval of the permit.

(Original emphasis.) Greenpeace did not appeal this decision to the superior court.

In July 2001, while Greenpeace's superior court appeal of the division director's and commissioner's decision to lift the stay was pending, a new statute relating to issuing temporary water use permits became effective.[2] Alaska Statute 46.15.155(e) states that "[t]he provisions of AS 46.15.080 do not apply to the issuance under this section of an authorization for temporary use of water."[3] Alaska Statute 46.15.080 pertains to findings and considerations necessary for issuing a permit.

DNR also amended 11 AAC 02.060, effective as of September 2001.[4] In part, the amendment abolished automatic stays during appeals of permits that are "revocable at will."[5] Instead, the amended regulation allows the commissioner to impose a stay in those disputes if the commissioner determines "that the public interest requires it."[6]

After the statute and regulation were amended, DNR and BPXA argued in the superior court that the amendments mooted

---

**2.** Ch. 100, § 13, SLA 2001 (making the relevant sections of the statute effective July 12, 2001).

**3.** Ch. 100, § 6, SLA 2001.

**4.** 11 AAC 02.060 (2003).

**5.** 11 AAC 02.060(c), (d) (2003).

**6.** 11 AAC 02.060(d) (2003).

Greenpeace's appeal from the administrative decision lifting the stay.

In Greenpeace's appeal of DNR's decision to lift the stay, the superior court held on October 5, 2001 that (1) the issues were not moot, because the public interest exception to the mootness doctrine applied, and (2) DNR had violated Greenpeace's due process rights. The court also decided that DNR's decision that concluded that lifting the stay was in the public interest was "arbitrary and capricious and a clear error [in] judgment."[7]

DNR appealed the superior court's decision. BPXA gave notice that it would join the appeal as an appellant.[8]

## III. DISCUSSION

### A. Standard of Review

 This case requires us to review the decision of the superior court sitting as an intermediate appellate court. When the superior court acts as an intermediate appellate court, "[w]e independently review the merits of [the] administrative determination."[9] We normally apply various standards of review when reviewing administrative decisions.[10] But here we do not need to review the merits of DNR's decision. Instead, in this case we address (1) a claim of mootness and (2) a due process argument by reviewing the constitutional sufficiency of the notice DNR gave to Greenpeace. The court exercises its discretion in deciding whether to address a moot issue.[11] We review questions of law and issues of constitutional interpretation de novo.[12]

### B. Public Interest Exception to Mootness

 DNR argues that Greenpeace's appeal from DNR's decision is moot because

---

7. The court seemed to define "public interest" per criteria set out in AS 46.15.080.

8. Alaska Rule of Appellate Procedure 204(g) states that "[a] party who files a notice of appeal, whether separately or jointly, is an appellant under these rules. All other parties are deemed to be appellees, regardless of their status in the trial court." DNR appealed the superior court's decision. BPXA filed no notice of appeal. DNR is therefore technically the only appellant; BPXA and Greenpeace are therefore both appellees. Nevertheless, when the parties submitted their briefs, we treated BPXA, which is aligned with DNR, as an appellant and chose to allow it to file a brief responding to Greenpeace's appellee's brief.

9. *Bruner v. Petersen*, 944 P.2d 43, 47 n. 5 (Alaska 1997).

10. We apply the de novo standard if the administrative agency's expertise provides little guidance to the court, or if the case concerns "statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience." *Kelly v. Zamarello*, 486 P.2d 906, 916 (Alaska 1971); *see also Tulkisarmute Native Cmty. Council v. Heinze*, 898 P.2d 935, 940 (Alaska 1995) ("Additionally, interpreting the applicable statutory requirements for granting a permit extension does not involve agency expertise. We consequently review the issues of statutory interpretation under the substitution of judgment standard."). We limit our review of an administrative regulation to " '(1) whether the regulation is reasonable and not arbitrary; and (2) whether the regulation is consistent with the statute and reasonably necessary to its purposes.' " *Lauth v. State*, 12 P.3d 181,

184 (Alaska 2000) (quoting *Bd. of Trade, Inc. v. State, Dep't of Labor, Wage & Hour Admin.*, 968 P.2d 86, 89 (Alaska 1998)). Whether the regulation is consistent with the statute involves statutory interpretation, which is a question of law, to which we apply our independent judgment. *See Payton v. State*, 938 P.2d 1036, 1041 (Alaska 1997). "We review an agency's interpretation of its own regulation under the reasonable basis standard, deferring to the agency unless it is 'plainly erroneous and inconsistent with the regulation.' " *Lauth*, 12 P.3d at 184 (quoting *Bd. of Trade*, 968 P.2d at 89). We review agency discretionary actions not requiring formal procedures under " 'the arbitrary and capricious or abuse of discretion standard.' " *Tulkisarmute*, 898 P.2d at 940 (quoting *Olson v. State, Dep't of Natural Res.*, 799 P.2d 289, 293 (Alaska 1990)).

> Under that standard "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

*Id.* (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

11. *Tulkisarmute*, 898 P.2d at 940 n. 7 ("Ultimately, the determination whether to review a moot question is left to the discretion of the court.") (quoting *Doe v. State*, 487 P.2d 47, 53 (Alaska 1971)).

12. *Revelle v. Marston*, 898 P.2d 917, 925 n. 13 (Alaska 1995).

TWUP A00–10 has expired; thus, no live controversy still exists. DNR points out that BPXA terminated water use under the disputed permit in May 2000, and that Greenpeace did not file a superior court appeal from DNR's July 2000 final decision that denied Greenpeace's agency appeal from the division's decision to issue the permit.

DNR also argues that this case does not fit within the "public interest" exception to the mootness doctrine. It maintains that Greenpeace's due process argument is dependent on the unique facts of this case, which DNR contends are "highly unlikely" to be repeated. DNR also asserts that "11 AAC 02.060 no longer imposes an automatic stay of a DNR decision to issue a temporary water use permit."

 TWUP A00–10 has expired. Disputes concerning that permit are consequently technically moot. We generally refrain "from deciding questions where events have rendered the legal issues moot." [13] Yet " 'where the matter is one of public concern and is recurrent but is capable of evading review,' there is a public interest exception to the mootness doctrine." [14] As we explained in *Hayes v. Charney:*

> The public interest exception involves the consideration of three main factors: 1) whether the disputed issues are capable of repetition, 2) whether the mootness doctrine, if applied, may repeatedly circumvent review of the issues and, 3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine. [15]

It appears to us that the disputed due process issues are capable of repetition. It is true that the legislature enacted AS 46.15.155 after TWUP A00–10 was issued, eliminating the requirement to apply the "public interest" criteria of AS 46.15.080(b) to decisions to issue temporary water permits. Nonetheless

the DNR commissioner may issue permits, and issuance decisions can still be stayed under 11 AAC 02.060. The constitutional sufficiency of procedures for resolving disputes about imposing and vacating stays of temporary water use permit decisions therefore remains a potentially recurring issue; only the factors to be considered during the appeal have changed. DNR has also amended 11 AAC 02.060, eliminating the automatic stay in appeals of permits that are revocable at will. Future disputes will no longer be governed by the version of 11 AAC 02.060 that applied to this case. Nevertheless, the amended regulation gives the commissioner discretion to impose stays and therefore inherently gives the commissioner discretion to lift them. It is immaterial that a decision to stay will be discretionary, not automatic, for TWUPs that are revocable at will. The constitutionality of the procedures the commissioner follows when deciding whether to lift stays will therefore continue to be an important and potentially recurring issue. Consequently, during any appeal of a TWUP, these same procedural issues may be repeated, even though the substantive factors governing the merits of the stay decision have changed.

Because TWUPs are necessarily temporary, especially those for seasonal construction of ice roads, there is a significant possibility they will expire before a stay or permit dispute is finally decided. [16] Therefore, rigorous application of the mootness doctrine makes it nearly impossible to obtain administrative and judicial review of a temporary permit. Greenpeace's temporary permit appeal consequently satisfies the second prong of the public interest exception test.

This brings us to the third prong. Natural resources are of prime importance to the public. Water is a key natural resource, listed in article VIII, sections 2 and 13 of the Alaska Constitution. [17] Likewise, concepts of

---

**13.** *Tulkisarmute*, 898 P.2d at 940 n. 7.

**14.** *Id.* (quoting *Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985)).

**15.** *Hayes*, 693 P.2d at 834.

**16.** The commissioner's final permit decision here was issued several weeks after TWUP A00–10 expired.

**17.** Article VIII, section 2 of the Alaska Constitution provides: "The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum bene-

fairness underlying the right to procedural due process are important. Whether a matter of public interest can be resolved on one-day's notice without offending due process raises a question of importance to the public. The issues here are therefore important enough to warrant review, notwithstanding their technical mootness. We conclude that this appeal as to the constitutionality of the procedure followed in lifting the stay satisfies the public interest exception to the mootness doctrine.

Greenpeace did not appeal from the merits of DNR's final decision to issue TWUP A00–10, but that does not foreclose an appeal from the procedural due process issues relating to the stay. The issue whether the procedure DNR followed in lifting the stay satisfied due process arises separately from the unpreserved question whether the permit should have been denied.

### C. Greenpeace's Standing To Raise the Due Process Issue

 As a preliminary matter, DNR argues that Greenpeace did not have a protected property interest at stake in the proceedings before DNR; it therefore asserts that no due process protection applies. DNR argues that Greenpeace has no more a property interest in this matter than all Alaska citizens, and that this interest is not sufficient for due process protection. It contends that Greenpeace is wrong in arguing on appeal that no property interest is required to entitle a litigant to due process.

We do not need to decide whether Greenpeace had a property interest in the DNR permit dispute. In *State, Department of Natural Resources v. Universal Education Society, Inc.*, we stated that an applicant for

an offshore mining lease "had no property right of which it was deprived by [DNR]'s denial of the application." [18] We nonetheless held that the applicant in that case was entitled "to a full and fair opportunity to present its case" to DNR.[19] Once Greenpeace challenged TWUP A00–10 administratively, it was entitled to due process, i.e., notice and an opportunity to be heard, while the agency resolved the permit dispute, including the stay issue.

### D. Original Notice and Opportunity To Be Heard

 DNR argues that it gave Greenpeace a meaningful opportunity to be heard consistent with due process requirements. DNR contends that it had to decide this case quickly, because delay "could have imposed a substantial financial burden" on both BPXA and the state and could have interfered with the construction schedule.

 Due process does not have a precise definition, nor can it be reduced to a mathematical formula.[20] It expresses a basic concept of justice

> such as "our traditional conception of fair play and substantial justice", the "protection of the individual from arbitrary action", "fundamental principles of liberty and justice", whether there has been a "(denial of) fundamental fairness, shocking to the universal sense of justice", "that whole community sense of 'decency and fairness' that has been woven by common experience into the fabric of acceptable conduct." [21]

When due process is required, "there is a certain level of procedural fairness that must be accorded to an affected party." [22] In ad-

fit of its people." Article VIII, section 13 of the Alaska Constitution provides:

> All surface and subsurface waters reserved to the people for common use, except mineral and medicinal waters, are subject to appropriation. Priority of appropriation shall give prior right. Except for public water supply, an appropriation of water shall be limited to stated purposes and subject to preferences among beneficial uses, concurrent or otherwise, as prescribed by law, and to the general reservation of fish and wildlife.

**18.** *State, Dep't of Natural Res. v. Universal Educ. Soc'y, Inc.,* 583 P.2d 806, 809 (Alaska 1978).

**19.** *Id.* at 810.

**20.** *Green v. State,* 462 P.2d 994, 996–97 (Alaska 1969) (citations omitted).

**21.** *Id.* (citations omitted).

**22.** *Nichols v. Eckert,* 504 P.2d 1359, 1364 (Alaska 1973).

**1064**

dition, the Alaska Constitution can offer broader protections than corresponding provisions of the United States Constitution.[23]

■ Administrative proceedings must comply with due process.[24] We have stated that

[t]he crux of due process is opportunity to be heard and the right to adequately represent one's interests. Adequate notice is the common vehicle by which these rights are guaranteed. Where notice is inadequate the opportunity to be heard can still be preserved and protected if a contestant actually appears and presents his claim.[25]

Similarly, we have stated that "notice must be reasonably calculated under all the circumstances to apprise the individual of the pendency of the deprivation and to afford an opportunity to present objections."[26]

In *Doe v. State* a summons ordered the appellant to appear before the court the following day, a Friday.[27] At the Friday hearing defense counsel asked for a continuance, and the court continued the hearing until Monday morning without asking counsel whether that was enough time.[28] We found that one day's notice was insufficient to afford a reasonable time to prepare.[29] We also found that two weekend days were insufficient for counsel to prepare the defense, especially considering that he had to prepare another minor's defense in a drug charge trial.[30] In *Johnson v. Johnson* we stated

that "due process requires notice and an opportunity to be heard prior to the deprivation of a property interest protected by the fourteenth amendment."[31] We nevertheless decline to establish a fixed minimum notice period, because the requirements of due process vary in different situations.[32]

The United States Supreme Court has said that to comply with due process requirements, notice "must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded."[33] The Court has emphasized that the hearing must occur before the property interest is taken away. In *Fuentes v. Shevin* the Court reviewed two statutes authorizing summary seizure of a person's goods under a writ of replevin without first granting notice to the possessor.[34] The Court held that these statutes deprived a person of property without due process of law insofar as they denied the right to be heard before chattels were taken from their possessor.[35] The Court reasoned as follows:

If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo

**23.** *Baker v. City of Fairbanks*, 471 P.2d 386, 401–02 (Alaska 1970).

**24.** *K & L Distribs., Inc. v. Murkowski*, 486 P.2d 351, 357 (Alaska 1971).

**25.** *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192–93 (Alaska 1980) (citations omitted).

**26.** *Miner's Estate v. Commercial Fisheries Entry Comm'n*, 635 P.2d 827, 832 (Alaska 1981).

**27.** *Doe v. State*, 487 P.2d 47, 56 (Alaska 1971).

**28.** *Id.*

**29.** *Id.* at 57.

**30.** *Id.*

**31.** *Johnson v. Johnson*, 544 P.2d 65, 70 (Alaska 1975) (citations omitted); *see also Waiste v. State*, 10 P.3d 1141, 1145 (Alaska 2000) (quoting *Hoff-*

*man v. State, Dep't of Commerce & Econ. Dev.*, 834 P.2d 1218, 1219 (Alaska 1992)) (" 'We have consistently held that, except in emergencies, due process requires the State to afford a person an opportunity for a hearing *before* the State deprives that person of a protected property interest.' " (Original emphasis.)).

**32.** *See, e.g., Fairbanks N. Star Borough Assessor's Office v. Golden Heart Utils., Inc.*, 13 P.3d 263, 274 (Alaska 2000) (holding that providing notice on Friday to property owner of assessor's position for Monday hearing gave sufficient notice).

**33.** *In re Gault*, 387 U.S. 1, 33, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), *cited in RLR v. State*, 487 P.2d 27, 40 (Alaska 1971).

**34.** *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

**35.** *Id.* at 96, 92 S.Ct. 1983.

the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred. "This Court has not ... embraced the general proposition that a wrong may be done if it can be undone." [36]

There are exceptions to this general rule. In *Fuentes* the Court stated that due process requires " 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' " [37] These extraordinary situations "must be truly unusual." [38] The Court has outlined when such situations had been found to exist in prior cases:

First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. Thus, the Court has allowed summary seizure of property to collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, and to protect the public from misbranded drugs and contaminated food.[39]

The Court conceded that due process imposes costs "in time, effort, and expense." [40] Yet, "[p]rocedural due process is not intended to promote efficiency or accommodate all possible interests: it is intended to protect the particular interests of the person whose possessions are about to be taken." [41]

In *Mathews v. Eldridge* the United States Supreme Court established a sliding scale for determining the specific dictates of due process in a particular situation.[42] It stated that the following three factors need to be considered:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[43]

Thus, what process is due depends on the interest implicated. But at a minimum, a litigant with standing to raise a valid question of public interest must be given notice and a fair opportunity to be heard.

DNR, by leaving Greenpeace a telephone message on January 27, 2000, notified Greenpeace that it had one day to oppose the lifting of the stay. The Greenpeace representative did not receive the message until several days later, because he was out of town. Although DNR gave Greenpeace prior notice that the stay might be lifted, it gave Greenpeace only one day to respond. One day was not enough time in which to prepare a response under these circumstances. If Greenpeace's contentions were correct, the temporary water use permit would have threatened fish and wildlife dependent on the Lower Kuparuk River. Based on the *Mathews* sliding scale, the importance of the issues in dispute and the consequences if DNR

36. *Id.* at 81–82, 92 S.Ct. 1983 (quoting *Stanley v. Illinois*, 405 U.S. 645, 647, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).

37. *Id.* at 82, 92 S.Ct. 1983 (original emphasis) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)); *see also Sniadach v. Family Fin. Corp. of Bay View*, 395 U.S. 337, 339, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Etheredge v. Bradley*, 502 P.2d 146, 153 (Alaska 1972).

38. *Fuentes*, 407 U.S. at 90, 92 S.Ct. 1983.

39. *Id.* at 91–92, 92 S.Ct. 1983 (citations omitted).

40. *Id.* at 92 n. 22, 92 S.Ct. 1983.

41. *Id.*

42. *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

43. *Id.* at 335, 96 S.Ct. 893.

was in error in issuing the permit entitled Greenpeace to time in which to oppose lifting the stay. Unlike *Doe*, this is a civil matter. But as we have seen above, civil litigants also have a right to prior notice and a fair opportunity to be heard. It does not matter that this was an administrative matter, not yet before a court, or that Greenpeace was a public interest litigant. Due process and the notion of fairness still apply.

Under the circumstances presented here, such an accelerated proceeding was not justified. BPXA asked for expedited consideration of its motion to lift the stay, but the circumstances did not require action within twenty-four hours. Neither of the first two conditions enumerated in *Fuentes* existed here. The permit allowed a private company to take a public resource. There is no valid claim that extending the stay a few more days would have deprived BPXA of compensable rights on a takings theory.

Second, no emergency existed. It appears from the record that while the stay was in place, BPXA could have taken water from the Kuparuk Deadarm Mine Site, two miles up the Kuparuk River. Dirk Smit, BPXA's Northstar Project Manager, stated in an affidavit that "[e]ven a short delay in ice road construction could mean an entire year's delay in the Northstar development." But this general assertion was not specific enough to explain why action within twenty-four hours was necessary. If project schedules were so critical that immediate action was required, a more specific showing surely could have been easily made discussing such facts as the construction schedule, the workdays available, and how soon work could begin. Other circumstances might also have been relevant. A general assertion that "even a short delay" would be prejudicial is insufficient to cut off a party's fair opportunity to be heard. This is not enough evidence to support a conclusion that using the alternate water source would have so seriously burdened BPXA and threatened the project to justify denying Greenpeace more than one day in which to be heard. Moreover, if "[e]ven a short delay" threatened the entire construction sea-

son as Smit asserted, and if the matter was truly as urgent as BPXA and DNR claim it was, it is odd that BPXA waited until January 27 to ask DNR to lift the stay imposed on January 14. We conclude that no extraordinary circumstances existed that justified denying Greenpeace a fair opportunity to be heard.

DNR consequently violated Greenpeace's right to notice and fair opportunity to be heard when DNR lifted the stay on January 28, only one day after BPXA asked DNR to do so.

### E. Subsequent Notice and Opportunity To Be Heard

■ We next consider whether this violation was cured by Greenpeace's subsequent opportunities to contest the stay and permit issues.

Greenpeace states that it originally asked DNR for access to the files on January 14, 2000. It claims that DNR ignored this request. Greenpeace again asked for the files when it requested reconsideration of the January 28 decision. Greenpeace claims that DNR ignored this second request until the end of February, by which time most of BPXA's water use was complete. Greenpeace consequently argues that DNR's action on reconsideration did not afford Greenpeace its "day in court," thus denying it due process.

In limited circumstances where an extraordinary situation, of the sort described in *Fuentes*, does not exist, due process may still be preserved by granting an opportunity to be heard after the initial decision. In *Johnson v. Johnson* the superior court issued a memorandum decision modifying a divorce decree because circumstances had changed; the court did this without providing the parties an opportunity to submit briefs or argue orally.[44] The ex-wife moved the court to reconsider its memorandum decision and order, but after hearing argument, the court denied her motion.[45] The ex-wife then appealed to this court, which affirmed the or-

44. *Johnson v. Johnson*, 544 P.2d 65, 68 (Alaska 1975).

45. *Id.*

der, albeit modifying it slightly.[46] We stated that "were this an appeal directly from the memorandum decision ... the due process violation would have been readily established, and the necessity of remand clear."[47] We then stated that

> Mrs. Johnson, however, moved the superior court to reconsider its decision on March 15, 1974. Pursuant to that motion, the plaintiff was able to file a supporting brief and a reply brief. In addition, on April 11, 1974, she appeared through her counsel before Judge Taylor and made substantially the same arguments she has made before this court on appeal. Thereafter, the "court, having fully considered the matters relevant thereto, and being fully advised in the premises", denied the motion for reconsideration.
>
> Thus, despite the apparent constitutional prematurity of [the] ... decision, this appeal does not come before us under such circumstances that one party has been completely deprived of either notice or an opportunity for a full hearing on the merits. Rather, the question confronting the court is whether the opportunity to brief and argue a motion for reconsideration of a decision suffices to satisfy constitutional due process.[48]

We decided that

> the plaintiff had her day in court. Under the particular facts of this case where the trial court was enforcing the terms of the prior decree, ample opportunity was afforded to brief and argue the merits and to introduce any evidence tending to disprove any of the trial judge's adverse findings. ... Mrs. Johnson was not deprived of any property rights without first having been afforded an opportunity to be heard. We hold that the due process provisions of the United States and Alaska Constitutions were not violated.[49]

In *Mitchell v. W.T. Grant Co.* the United States Supreme Court upheld a Louisiana sequestration procedure that permitted the creditor to obtain a writ of sequestration without providing prior notice to the debtor.[50] The Court reasoned that because the statute (1) entitled the debtor to immediately seek dissolution of the writ unless the creditor proved certain matters and (2) granted damages to the debtor under certain conditions, the statute balanced the two parties' constitutional interests.[51] The Court stated that no hearing at a preliminary stage is necessary as long as the requisite hearing is provided before the final decision becomes effective: "The usual rule has been '(w)here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.'"[52]

Even after DNR lifted the stay, Greenpeace had an opportunity to present its case, and it exercised that opportunity. On February 7 Greenpeace requested that DNR reconsider the lifting of the stay; this request was similar to Mrs. Johnson's superior court motion for reconsideration. This request also stated that Greenpeace had "not yet been able to review the administrative record" and asked for access to it. On February 25 the commissioner denied Greenpeace's request for reconsideration and stated that TWUP A00–10 was available for review during business hours. He also stated that Greenpeace (1) "failed to provide any countervailing evidence or argument" on the points BPXA raised in its motion to lift the stay and (2) relied on "unsubstantiated allegations that do not provide any new information or legitimate reason that justifies [the commissioner's] reversing [his] original decision to lift the automatic stay." Thus, as in *Johnson* and *Mitchell*, Greenpeace had opportunities to contest DNR's decision, and it

---

**46.** *Id.* at 75.

**47.** *Id.* at 71.

**48.** *Id.*

**49.** *Id.*

**50.** *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974).

**51.** *Id.* at 606–07, 94 S.Ct. 1895.

**52.** *Id.* at 611–12, 94 S.Ct. 1895 (quoting *Phillips v. Comm'r*, 283 U.S. 589, 596–97, 51 S.Ct. 608, 75 L.Ed. 1289 (1931)).

continued to do so. It simply failed to convince the commissioner that the stay should be reimposed. Lifting the stay on January 28 was not the commissioner's final decision; although lifting the stay only one day after BPXA asked DNR to do so violated Greenpeace's due process rights, DNR nonetheless ultimately granted Greenpeace the process it was due by reviewing its request for reconsideration.

Greenpeace contended that DNR denied it access to information, but the commissioner in his letter of February 25 informed Greenpeace that it could view TWUP A00–10 and the rest of the administrative record during business hours. The commissioner granted Greenpeace four weeks to view these documents and submit any additional argument or evidence. The letter provided a contact person's name and telephone number, so that Greenpeace could make the necessary arrangements. DNR therefore gave Greenpeace access to the relevant documents. Accordingly, the procedures DNR followed after it lifted the stay preserved Greenpeace's right to due process.

### F. Reviewability of the Merits of Lifting the Stay of TWUP A00–10

██ DNR argues that the superior court erred in ruling that because DNR did not apply statutory public interest criteria for issuing a permit, DNR's decision to lift the stay was arbitrary and capricious. DNR also argues that the case is moot. Greenpeace argues that the superior court correctly decided that DNR arbitrarily and capriciously ignored the public interest when it lifted the automatic stay.

Given the unusual circumstances of this case, we see no justification for judicial review of the merits of the decision to lift the stay. The issue is certainly moot. Deciding whether the commissioner and the division director were correct in lifting the stay would necessarily implicate the merits of DNR's decision to issue TWUP A00–10. But Greenpeace did not appeal to the superior court from the final administrative decision the commissioner and the division director issued in July 2000 denying Greenpeace's administrative permit appeal. And the permit itself

expired in July 2000. Moreover, the controlling statute and regulation were both amended in 2001, after the permit expired and before the superior court ruled on the stay issue. These circumstances mooted the question whether DNR should have reinstated the stay.

The public interest exception does not justify judicial resolution of the mooted issue. The amendments to the statute and regulation make it unlikely the issue will recur, and our discussion of the due process issue makes it unlikely DNR will lift a stay without giving adequate notice. It is also difficult to characterize the permit issue as "so important" as to warrant review despite its mootness, given that Greenpeace did not appeal the permit issue to the superior court. We conclude that the justifications for considering the moot due process issue discussed in Part III.B do not apply to the merits of the decision lifting the stay. We also think that the stay issue should not be a proxy for resolving the unpreserved permit issue. We therefore vacate the portion of the superior court decision that held that DNR's decision to lift the stay was arbitrary and capricious.

We decline to decide other ancillary questions that Greenpeace invites us to answer, because we conclude that they also turn on the merits of the permit decision and are therefore moot.

### G. Attorney's Fees

DNR and BPXA argue that because they should have won, Greenpeace should not be considered the prevailing party. They therefore ask that we vacate the superior court's award of attorney's fees to Greenpeace.

██ Because we conclude that the due process violation ultimately did not prevent Greenpeace from being heard, it did not prevail on the due process issue. And all other issues are moot. We therefore vacate the superior court's award of attorney's fees.

### IV. CONCLUSION

The public interest exception to the mootness doctrine justifies judicial review of the

due process issue, but not the merits of the decision lifting the stay. Even though DNR initially violated Greenpeace's right to due process, DNR later cured that violation by permitting Greenpeace to move for reconsideration. We therefore REVERSE the superior court's decision and VACATE Greenpeace's award of attorney's fees.